**CITY OF BOLIVAR, Missouri,**
**Plaintiff–Respondent,**

v.

**Jack L. LACY, Defendant–Appellant.**

No. 25808.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 30, 2004.

Motion for Rehearing and Transfer
Denied Oct. 22, 2004.

Application for Transfer Denied
Nov. 23, 2004.

R. Lynn Myers, Springfield, for appellant.

John W. Forkner, Douglas, Haun, Kirksey & Heidemann, P.C., Bolivar, for respondent.

KENNETH W. SHRUM, Judge.

A jury found Jack L. Lacy ("Appellant") violated a municipal ordinance of the City of Bolivar ("City"). Appellant was fined and he now appeals. He urges reversal for two reasons: First, he claims City failed to prove the existence and terms of the ordinance he allegedly violated, and second, he argues City failed to adduce sufficient evidence to support a finding that he violated the ordinance. We disagree. We affirm.

## FACTS

Appellant was found guilty of violating section 225.670 of City's municipal ordinances, namely, that Appellant interfered with, hindered, or obstructed officers of the City in the performance of their duties. Specifically, City charged that Appellant had physically held, forcibly detained, or willfully obstructed such officers while they "were attempting to transport [Appellant] on a 96–hour hold." [1]

The following are background facts to the ordinance violation. In the summer of 2001, Appellant was a dialysis patient at a clinic in Bolivar, Missouri. Before September 10, 2001, he complained frequently to clinic staff and others about the quality of treatment he received at the clinic. Appellant's physician, Dr. Sommerfeld, and clinic employees talked with Appellant in attempts to deal with his concerns. Following these conversations, the staff believed Appellant's concerns were alleviated, yet they would learn a week or two later that Appellant had reprised his complaints and he was angry again.

---

1. Section 632.305.3 (RSMo 2000) authorizes a "peace officer [to] take a person into custody for detention for evaluation and treatment for a period not to exceed ninety-six hours," but *only* when such peace officer "has reasonable cause to believe that such person is suffering from a mental disorder and ... the likelihood of serious harm by such person to himself or others is imminent unless such person is immediately taken into custody."

As time passed, Dr. Sommerfeld noticed that Appellant's anger was accelerating, even to the point that he was making physical threats against other patients. Then, on the morning of September 10, 2001, Appellant spoke with clinic personnel over the telephone, telling them he "was unhappy with the situation" and it was a "sad day for Bolivar." When the clinic employees "pressed the point" by asking Appellant, "[w]hat do you mean," Appellant answered "he would bring a shotgun to the dialysis center and possibly blow his brains out."

When told of these remarks, a concerned Dr. Sommerfeld contacted Dr. Neal, a psychiatrist. After giving Dr. Neal a history and discussing the problem with him, Dr. Sommerfeld concluded Appellant "was a threat, not only to himself for physical harm, but to others" at the clinic. He then asked Dr. Neal about the procedure for getting a "96–hour hold" for Appellant so that he might be evaluated. Armed with that information, Dr. Sommerfeld went to the clinic to pursue the "96–hour hold" action.

Upon being notified of the situation at the clinic, the Bolivar police department dispatched officer Wollard to the clinic. On his arrival, Wollard met with Dr. Sommerfeld and other clinic supervisors. The staff told Wollard of their concerns regarding Appellant, including his "shotgun" remark made earlier that day. From this discussion, Wollard concluded something should be done. Collectively, the group (Wollard, Dr. Sommerfeld, and other clinic personnel) decided Appellant "needed to be committed for a 96–hour [period] to have his mental state evaluated."

As Appellant walked toward the front of the clinic building, he was met by Wollard. After Wollard told Appellant he was putting him "on a 96–hour hold to have his mental status evaluated," Appellant became angry, telling Wollard "he was not big enough to make me go anywhere." As this conversation progressed, Appellant began moving back, toward the vehicle in which he had arrived, when he saw another Bolivar police officer standing in front of Dr. Sommerfeld.

At that point, Appellant "got into a defensive stance" while swinging his fists at the second policeman (officer Thompson) and Dr. Sommerfeld. Because Appellant was within "arm's length" of him, Thompson "raised [his] hand up, blocked the punch, and grabbed" Appellant. Appellant continued to struggle despite Thompson's attempts at restraint. Eventually, Appellant was handcuffed, but continued to struggle even though Thompson asked that he "stop resisting." The jury found Appellant guilty of the offense charged, and this appeal followed.

### Point I: Alleged Failure to Introduce Ordinance into Evidence

■ Appellant's first point concerns the code provision he allegedly violated. Appellant maintains the trial court erred by not sustaining his motions for directed verdict because City never placed in evidence the ordinance under which Appellant was charged and convicted. He insists that, in the absence of proof of the contents of the subject ordinance, his alleged violation remains unproven.[2]

In developing this argument, Appellant claims that he "finally got a copy of Exhibit 1 [City's code of ordinances] and the

2. In *University City v. MAJ Investment Corp.,* 884 S.W.2d 306 (Mo.App.1994), the court held that "[a]bsent proof of the existence and content of [a municipal] ordinance defining the offense for which [an] appellant [is] charged, the conviction cannot stand." *Id.* at 307[4].

'certification' " *after the trial.* It was at that point when he learned the certification used at trial simply recited, "I Dale Newcomb, City Clerk … certify that the following pages constitute a true and correct copy of *Ordinance 2354* of said City, *as passed by the City Council on January 9, 2003.*" (Emphasis supplied.)[3] Appellant argues that, since the certification failed to show Exhibit 1 contained the ordinances of Bolivar in effect September 10, 2001 (the date of his offense), his conviction cannot stand.

City's response is twofold. First, City claims that it placed in evidence the code provision under which Appellant was charged and convicted. Second, it maintains Appellant waived any complaint about the admission of the ordinance by not objecting to the document as proffered.

■ Historically, the rule in Missouri has been that courts will not take judicial notice of the ordinances of municipalities. *Consumer Contact Co. v. State, Dept. of Rev.,* 592 S.W.2d 782, 785[4], n. 2 (Mo.banc 1980); *City of St. Louis v. Roche,* 128 Mo. 541, 31 S.W. 915, 916 (Mo.1895); *St. Louis County v. Afshari,* 938 S.W.2d 303, 305[5] (Mo.App.1997). At a bare minimum, a valid municipal prosecution requires the ordinance allegedly violated be made a part of the record, either by formal proof or stipulation. *Id.* at 305[4].

As this trial started, City's attorney addressed the court and stated, "as a preliminary matter I would like to present the Bolivar city code and ask the Court to take judicial notice of the code." In apparent recognition that he could not take judicial notice of Bolivar's municipal ordinances, the trial judge simply ignored the request of City's lawyer. Instead, the judge asked if the proffered code was a certified copy. City's lawyer answered "[y]es," whereon the judge asked the defense lawyer if he had seen a copy. He answered no, but announced "I have no objection to it." The judge suggested, "Let's mark it and offer it into evidence." Thereon, City's code book was marked as Exhibit 1 and the judge announced, "Exhibit 1 will be admitted without objection." Appellant's lawyer then confirmed he had no objection to Exhibit 1 being admitted.

Whether it is said that City's code was made a part of the record by formal proof or by stipulation is of no consequence; the fact is the code was entered into evidence after Appellant's lawyer stated affirmatively on two separate occasions that he had no objection to its admission. Because the code was put before the court, its existence and terms were known, the offense was defined, and Appellant's alleged misconduct could be shown and measured. As such, the reasons for the necessity of proving a municipal ordinance were met. *Cf. MAJ Investment,* 884 S.W.2d at 307; *City of Boonville v. Martin,* 694 S.W.2d 295, 296 (Mo.App.1985).

Specifically, the trial court and this court can verify that the code contained section 225.670, which was the provision City charged Appellant with violating. Moreover, the code's presence in the record enabled the trial court and now this court to decide (if necessary) whether the information alleged sufficient facts to charge conduct proscribed by the ordinance and, if so, whether sufficient probative facts were introduced to prove the offense charged. *See City of Kansas City v. Scanland,* 506 S.W.2d 18, 21 (Mo.App.1974);

---

**3.** The referenced Ordinance (No. 2354) did not enact or create the offense of unlawful interference with an officer (the offense with which Appellant was charged); it simply adopted and enacted an "amended City Code" as of January 9, 2003.

*City of Kansas City v. Narron,* 493 S.W.2d 394, 401–02 (Mo.App.1973).

Further, we have not ignored Appellant's claim that City did not establish at trial that the code provision under which he was charged was in effect on September 10, 2001. This argument is answered by *City of Berkeley v. Stringfellow,* 783 S.W.2d 501[5] (Mo.App.1990), as follows:

> "[D]efendant failed to object when the prosecutor presented the ordinance for admission by stipulation of the parties. Challenges to the validity of an ordinance, like challenges to the constitutionality of an ordinance, must be raised at the first opportunity that good pleading and orderly procedure permit and if not so raised are deemed waived. In failing to raise the issue of the validity of the ordinance at the first available opportunity, she waived her right to challenge it."

*Id.* at 504 (citations omitted).

The foregoing comments in *Stringfellow* govern here. When Appellant affirmatively announced (twice) that he had no objection to admission of the code and it was admitted in evidence, he waived his right to challenge it for the reasons now asserted. Point I is denied.[4]

### Point II: Sufficiency of the Evidence Issue

■ Appellant's second point maintains that the trial court erred in failing to sustain his motion for a directed verdict. In essence, his argument is based on the fact that "Missouri law requires that an officer

must actually be performing his duties for someone to be found liable for unlawful interference with those duties."

Under this point, Appellant asserts that neither Wollard nor Thompson had "reasonable cause" to believe Appellant was suffering from a mental disorder, a prerequisite to detention by a police officer under section 632.305.3. He also argues that neither Wollard nor Thompson had "reasonable cause" to believe there was an "imminent" danger that Appellant might harm himself or others. Based on these claims, Appellant argues the officers were not performing a duty under section 632.305.3; consequently, City failed to prove he "interfered" with Wollard and Thompson in the performance of any duty imposed on them by that statute.

In arguing the officers had no "reasonable cause" to believe Appellant had a mental disorder, Appellant singles out two of Wollard's remarks made during cross-examination. First, Wollard said he did not make a "mental disorder" evaluation of Appellant as part of the detention process because he was not qualified to do so. Second, Wollard testified he was not familiar "with what a mental disorder is, because ... [he was] not a mental health coordinator or official." In addition, Appellant cites Thompson's testimony that he made no investigation to determine if detention was proper under section 632.305.3. Appellant urges reversal due to insufficient proof of "reasonable cause" to detain because of these three isolated bits of evi-

---

4. Likewise, we have not ignored the cases primarily relied upon by Appellant, i.e., *Kansas City v. Baker,* 793 S.W.2d 646 (Mo.App. 1990), and *Afshari,* 938 S.W.2d 303. These cases do not aid Appellant. In *Baker,* the parties stated they intended to place the applicable ordinances in evidence by stipulation, yet that never occurred; consequently, the ordinances were not before the trial court or

the appellate court in any form. *Id.* at 648. In *Afshari,* the municipality "wholly failed to offer into evidence any part of § 118.2 [of an ordinance], the alleged violation of which likely contributed to defendant's sentence." *Id.* at 305. The facts in *Baker* and *Afshari* render them inapposite as authority to support Appellant's argument.

dence. Such argument ignores our standard of review.

▆▆▆ Where the sufficiency of the evidence is at issue in a jury tried case involving violation of a municipal ordinance, we review the evidence in the light most favorable to the verdict and decide if there was substantial evidence to reasonably support a submissible case. *City of Cape Girardeau v. Jones*, 725 S.W.2d 904, 907 (Mo.App.1987). We will reverse a judgment based on a jury verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion. *Rankin v. Venator Group Retail, Inc.*, 93 S.W.3d 814, 819[2] (Mo.App.2002). Where reasonable minds can differ on the question before the jury, we will not disturb the jury's verdict. *Id.*

On review of this record, we find the jury could reasonably conclude that Wollard had reasonable cause to believe Appellant was suffering from a mental disorder. Although Wollard was not a doctor or psychologist, he had received training on identifying people with mental or psychological problems. This occurred in a class attended by Wollard and conducted by a mental health coordinator.

Moreover, Wollard investigated and obtained information about Appellant before detaining him. Specifically, Wollard talked with Dr. Sommerfeld and three clinic supervisors on the morning of September 10, 2001. During this meeting he was told of Appellant's "history with the clinic." He learned, *inter alia*, that Appellant had "been discontented with his treatment at the center for some time," Appellant's "latest threat" came via a phone call on September 10, and this threat included remarks that it would be a "sad day for Bolivar" as he (Appellant) would "bring a shotgun to the dialysis center and possibly blow his brains out."

Wollard also testified he found nothing during his investigation to suggest that information provided by Sommerfeld and the other staff was unreliable. To the contrary, Wollard concluded "they were generally concerned about [Appellant's] health and ... well-being." After investigating and consulting with clinic staff and Dr. Sommerfeld, Wollard concluded he had "good reason" to consider and act upon Dr. Sommerfeld's recommendation that Appellant be detained for a mental evaluation. Wollard explained that, although he could not necessarily define a mental disorder, his training led him to conclude that "if a person is threatening to harm himself, then that possibly is an indication of a mental disorder." From the foregoing, we find probative facts from which the jury could conclude that Wollard had "reasonable cause" to believe Appellant was suffering from a mental disorder. We reject Appellant's argument to the contrary.

Appellant's claim of insufficient evidence to support Wollard's and Thompson's "reasonable cause" belief of "imminent" danger also focuses on evidence favorable to his position and ignores that which is unfavorable to him. For instance, Appellant points to his testimony that his first mention of a shotgun was made to a clinic manager approximately a week before September 10. Specifically, he asked her, "just what in the world do I have to do to solve [my complaints]? Do I have to come in here with a shotgun and shoot myself?" From that, Appellant argues "no one considered the matter urgent at that time." The simple answer to his argument is that this conversation was not made known to police authorities in Bolivar until September 10, and when they learned of it, they promptly took action.

Additionally, Appellant argues that "no one acted as if they believed [Appellant] was in fact a threat to himself or others or

was bringing a gun to the Clinic." For instance, he notes that Wollard allowed Dr. Sommerfeld and his staff to come out and meet Appellant; actions which he claims a person would never do if that person believed Appellant was actually armed. This argument ignores evidence that, when Wollard first confronted Appellant, he did not know where the doctors and nurses were. It also ignores evidence that Appellant suffered from many debilitating illnesses and that Dr. Sommerfeld and others at the clinic were "generally concerned about [Appellant's] health and ... well-being." From this the jury reasonably could have inferred that the medical personnel were willing to help Appellant even if it meant exposing themselves to potential danger.

Going further, Appellant claims that an absence of reasonable cause to believe danger was "imminent" is found in testimony that, as Wollard approached and detained Appellant, he never asked Appellant if he had a gun. Moreover, he points to admissions by all witnesses that Appellant did not have a gun with him at the clinic on September 10 as showing a failure of proof of the imminent danger element. This ignores evidence that Appellant had grown increasingly angry over alleged mistreatment of him at the clinic, he had been discontented with his treatment at the center for some time, his "latest threat" occurred September 10, and such threat included remarks that it would be a "sad day for Bolivar" as he would "bring a shotgun to the dialysis center and possibly blow his brains out." It also ignores Wollard's testimony that, although he saw no gun in Appellant's hand as they approached one another, it was only after Wollard placed Appellant in custody that he knew Appellant was unarmed.

In yet another argument, Appellant cites *State v. Huett*, 340 Mo. 934, 104 S.W.2d 252 (1937), as authority for the notion that "imminent" means "threatening to occur immediately; near at hand; impending." *Id.* at 262. We note, however, that the *Huett* court was considering the term "imminent" while analyzing a self-defense instruction in a murder case. *Id.* That is not the factual context in which the term is being used here.

In so stating, we do not ignore that at one point Wollard testified "imminent" might mean "immediate." However, he offered this additional explanation during cross-examination:

"Q. [by Appellant's lawyer] [W]hat would your definition of immediate be? . . . . At what level did you believe [Appellant] might ... pose a danger?

"A. In the near future.

"Q. And by near future, did you mean that morning, that day, that week, that month?

"A. That morning, the next day, sometime that week.

"Q. So you felt that that danger was not limited to 11:35 a.m. on September 10th?

"A. No. . . . If that day had passed with no incident, the threat did not go away."

Dr. Sommerfeld confirmed Wollard's expressed belief that the "threat" of Appellant harming himself or others was "imminent" even though Appellant did not bring a gun to the clinic. During cross-examination, he explained as follows:

"Q. [To Dr. Sommerfeld] On that day, was it of immediate apparency [sic] he was going to harm himself at that time, or was it a concern somewhere in the future?

"A. I guess you'd have to define immediate.

"Q. Well, right then.

"A. Or is it, goes home and gets the gun and comes back.

"Q. Well—

"A. I don't know. That's pretty immediate, as well.

"Q. Immediate is immediate if that's what it says.

"A. And we weren't going to follow him back home to see if he got a gun."

Although evidence exists from which a jury could find Wollard and Thompson lacked reasonable cause to believe there was an "imminent" likelihood Appellant would harm himself or others, we find the contrary is also true, that is, sufficient probative facts exist to support a jury finding that the policemen had reasonable cause to believe there was imminent danger. The existence of the latter evidence renders inapposite the single case cited by Appellant in support of the point, *City of St. Louis v. Carroll,* 494 S.W.2d 1 (Mo. 1973).[5]

Unlike *Carroll,* where no factual dispute existed about whether the license collector was discharging his official duties (*see* n. 5), sufficient evidence was adduced here to support the jury's finding that Wollard and Thompson were discharging duties under section 632.305.3 when they attempted to detain Appellant for a mental evaluation. There was also ample evidence adduced to support a finding that Appellant physically held, forcibly detained, or willfully ob-

structed these officers in the performance of their section 632.305.3 duty and thereby violated the ordinance. Point II is denied.

The judgment is affirmed.

PARRISH, P.J., and BARNEY, J., concur.

---

5. In *Carroll,* an ordinance authorized the license collector of St. Louis "to seize and impound any coin-operated amusement device or slot machine ... [if] being operated or exposed for operation." *Id.* at 2 (emphasis supplied). When the license collector tried to enter a river boat and seize machines located there, Carroll denied him access. Carroll was charged and convicted of interfering with the license collector's performance of his duties. His conviction was reversed on appeal because "[a]t the time ... collector presented himself to make the seizure the boat was closed, a fire drill was in progress and the machines were neither being operated nor exposed for operation.... At that time ... collector had no right to seize and impound these machines and no right to demand entry onto the S.S. Admiral for that purpose. In denying the license collector access to the vessel under the circumstances appellant was not unlawfully hindering, obstructing, resisting or otherwise interfering with the discharge of the official duties of the license collector." *Id.* at 5[6].